14-mc-0103

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

**FILED**
UNITED STATES DISTRICT COURT
DENVER

JUN 12 2014

JEFFREY P. COLWELL
CLERK

**SECURITIES AND EXCHANGE COMMISSION,**

        **Plaintiff**

vs.

**BILLY WAYNE McCLINTOCK, individually, and dba MSC HOLDINGS, DIANNE ALEXANDER aka LINDA DIANNE ALEXANDER,**

        **Defendants,**

**MSC HOLDINGS USA, LLC, MSC HOLDINGS, INC.,  MSC GA HOLDINGS, LLC,**

        **Relief Defendants.**

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action File No.

1:12-CV-04028-SCJ

## ORDER APPOINTING RECEIVER

**WHEREAS** this matter has come before this Court upon motion of the Plaintiff U.S. Securities and Exchange Commission ("SEC", "Commission" or "Plaintiff") to appoint a receiver in the above-captioned action; and,

**WHEREAS** the Court finds that, based on the record in these proceedings, the appointment of a receiver in this action is necessary and appropriate for the purposes of marshaling and preserving all assets of MSC Holdings (the dba of

**EXHIBIT B**

Defendant Billy Wayne McClintock ("McClintock")), and Relief Defendants MSC

Holdings USA, LLC, MSC GA Holdings, LLC, and MSC Holdings, Inc.

("Receivership Assets") and those assets of Defendants McClintock, and Dianne

Alexander (aka Linda Dianne Alexander) ("Alexander") that: (a) are attributable to

funds derived from investors in the scheme described in the SEC's complaint; (b)

are held in constructive trust for the defendants; (c) were fraudulently transferred

by the defendants; and/or (d) may in equity otherwise be includable as assets of the

Receivership Estate (collectively, the "Recoverable Assets"); and,

WHEREAS this Court has subject matter jurisdiction over this action and

personal jurisdiction over the defendants, and venue properly lies in this district.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND

DECREED THAT:

1.    This Court hereby takes exclusive jurisdiction and possession of the

assets, of whatever kind and wherever situated, of MSC Holdings, MSC Holdings

USA, LLC, MSC GA Holdings LLC, and MSC Holdings, Inc. (collectively, the

"Receivership Defendants").  In addition, the Court hereby declares that, although

the Court is not at this time appointing a receiver over Defendants Alexander and

McClintock individually, all assets, in whatever form, however held, and wherever

situated, attributable to the scheme described in the SEC's complaint, shall be

2

considered Recoverable Assets subject to being brought within the receivership.

2.      Until further Order of this Court, Jason L. Nohr of Cauthorn Nohr &
Owen is hereby appointed to serve without bond as receiver (the "Receiver") for
the Receivership Defendants.

## I. Asset Freeze

3.      Except as otherwise specified herein, all Receivership Assets and
Recoverable Assets are frozen until further order of this Court.  Accordingly, all
persons and entities with direct or indirect control over any Receivership Assets
and/or any Recoverable Assets, other than the Receiver, are hereby restrained and
enjoined from directly or indirectly transferring, setting off, receiving, changing,
selling, pledging, assigning, liquidating or otherwise disposing of or withdrawing
such assets.  This freeze shall include, but not be limited to, Receivership Assets
and/or Recoverable Assets that are on deposit with financial institutions such as
banks, brokerage firms and mutual funds.

## II. General Powers and Duties of Receiver

4.      The Receiver shall have all powers, authorities, rights and privileges
heretofore possessed by the officers, directors, managers and general and limited
partners of the Receivership Defendants under applicable state and federal law, by
the governing charters, by-laws, articles and/or agreements in addition to all

powers and authority of a receiver at equity, and all powers conferred upon a receiver by the provisions of 28 U.S.C. §§ 754, 959 and 1692, and Fed.R.Civ.P. 66.

5.　　The trustees, directors, officers, managers, employees, investment advisers, accountants, attorneys and other agents of the Receivership Defendants are hereby dismissed and the powers of any general partners, directors and/or managers are hereby suspended.  Such persons and entities shall have no authority with respect to the Receivership Defendants' operations or assets, except to the extent as may hereafter be expressly granted by the Receiver.  The Receiver shall assume and control the operation of the Receivership Defendants and shall pursue and preserve all of their claims.

6.　　No person holding or claiming any position of any sort with any of the Receivership Defendants shall possess any authority to act by or on behalf of any of the Receivership Defendants.

7.　　Subject to the specific provisions in Sections III through XIV, below, the Receiver shall have the following general powers and duties:

>　A.　To use reasonable efforts to determine the nature, location and value of all property interests of the Receivership Defendants and all Recoverable Assets, including, but not limited to, monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, rights and other assets, together with all rents, profits, dividends, interest or other income attributable

thereto, of whatever kind, which the Receivership Defendants own, possess, have a beneficial interest in, or control directly or indirectly ;

B.    To take custody, control and possession of all Receivership Assets and records relevant thereto from the Receivership Defendants; to sue for and collect, recover, receive and take into possession from third parties all Receivership Assets and Recoverable Assets and records relevant thereto;

C.    To manage, control, operate and maintain the Receivership Estate and hold in his possession, custody and control all Receivership Assets, pending further Order of this Court;

D.    To use Receivership Assets for the benefit of the Receivership Estates, making payments and disbursements and incurring expenses as may be necessary or advisable in the ordinary course of business in discharging his duties as Receiver;

E.    To take any action which, prior to the entry of this Order, could have been taken by the officers, directors, partners, managers, trustees and agents of the Receivership Defendants;

F.    To engage and employ persons in his discretion to assist him in carrying out his duties and responsibilities hereunder, including, but not limited to, accountants, attorneys, securities traders, registered representatives, financial or business advisers, liquidating agents, real estate agents, forensic experts, brokers, traders or auctioneers;

G.    To take such action as necessary and appropriate for the preservation of Receivership Assets and Recoverable Assets or to prevent the dissipation or concealment of Receivership Assets and/or Recoverable Assets;

H.    The Receiver is authorized to issue subpoenas for documents and testimony consistent with the Federal Rules of Civil Procedure;

I.   To bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging his duties as Receiver;

J.   To pursue, resist and defend all suits, actions, claims and demands which may now be pending or which may be brought by or asserted against the Receivership Estate; and,

K.   To take such other action as may be approved by this Court.

### III. Access to Information

8.   The past and/or present officers, directors, agents, managers, general and limited partners, trustees, attorneys,  accountants and employees of the Receivership Defendants, as well as those acting in their place, are hereby ordered and directed to preserve and turn over to the Receiver forthwith all paper and electronic information of, and/or relating to, the Receivership Defendants and/or all Receivership Property; such information shall include but not be limited to books, records, documents, accounts and all other instruments and papers.

9.   Within ten (10) days of the entry of this Order, Defendants Alexander and McClintock shall serve upon the Receiver and the Commission a sworn statement, listing: (a) the identity, location and estimated value of all Receivership Assets and Recoverable Assets; (b) all employees (and job titles thereof), other personnel, attorneys, accountants and any other agents or contractors of the Receivership Defendants; and, (c) the names, addresses and amounts of claims of

all known creditors of the Receivership Defendants.

10.    Within thirty (30) days of the entry of this Order, Defendants

Alexander and McClintock shall serve upon the Receiver and the Commission a

sworn statement and accounting, with complete documentation, covering the

period from January 1, 2002 to the present:

A.    Of all Receivership Assets and Recoverable Assets, wherever located,  including, but not limited to: (a) all securities, investments, funds, real estate, automobiles, jewelry, coins, and other assets, stating the location of each; and (b) any and all accounts, including all funds held in such accounts, with any bank, brokerage or other financial institution, including the account statements from each bank, brokerage or other financial institution;

B.    Identifying every account at every bank, brokerage or other financial institution: (a) over which Defendants Alexander and/or McClintock have signatory authority; and (b) opened by, in the name of, or for the benefit of, or used in connection with the scheme described in the Commission's complaint;

C.    Identifying all credit, bank, charge, debit or other deferred payment card issued to or used by Defendants Alexander and McClintock, and each Receivership Defendant, including but not limited to the issuing institution, the card or account number(s), all persons or entities to which a card was issued and/or with authority to use a card, the balance of each account and/or card as of the most recent billing statement, and all statements for the last twelve months;

D.    Of all assets received by the Receivership Defendants from any person or entity, including the value, location, and disposition of any assets so received;

    E.    Of all funds received by the Receivership Defendants, and each of them, in any way related, directly or indirectly, to the conduct alleged in the Commission's Complaint. The submission must clearly identify, among other things, all investors/lenders, the date and amount of their investments/loans, and the current location of such funds;

    F.    Of all expenditures exceeding $1,000 made by any of them, including those made on their behalf by any person or entity; and

    G.    Of all transfers of assets made by any of them.

    11.    Within thirty (30) days of the entry of this Order, Defendants Alexander and McClintock shall provide to the Receiver and the Commission copies of the Receivership Defendants' federal income tax returns for the years 2002 through 2011 with all relevant and necessary underlying documentation.

    12.    Defendants Alexander and McClintock, and the Receivership Defendants' past and/or present officers, directors, agents, attorneys, managers, shareholders, employees, accountants, debtors, creditors, managers and general and limited partners, and other appropriate persons or entities shall answer under oath to the Receiver all questions which the Receiver may put to them and produce all documents as required by the Receiver regarding the business of the Receivership Defendants, or any other matter relevant to the operation or administration of the receivership or the collection of funds due to the Receivership Defendants and/or Recoverable Assets. In the event that the Receiver deems it necessary to require

the appearance of the aforementioned persons or entities, the Receiver shall make

its discovery requests in accordance with the Federal Rules of Civil Procedure.

13.     To issue subpoenas to compel testimony of persons or production of

records, consistent with the Federal Rules of Civil Procedure and applicable Local

Rules, except for the provisions of Fed.R.Civ.P. 26(d)(1), concerning any subject

matter within the powers and duties granted by this Order.

14.     Defendants Alexander and McClintock, and all agents of the

Receivership Defendants are required to assist the Receiver in fulfilling his duties

and obligations.  As such, they must respond promptly and truthfully to all requests

for information and documents from the Receiver.

### IV.  Access to Books, Records and Accounts

15.     The Receiver is authorized to take immediate possession of all assets,

bank accounts or other financial accounts, books and records and all other

documents or instruments relating to the Receivership Defendants.  All persons

and entities having control, custody or possession of any Receivership Asset and/or

Recoverable Asset are hereby directed to turn such asset(s) over to the Receiver.

16.     The Receivership Defendants, as well as their agents, servants,

employees, attorneys, any persons acting for or on behalf of the Receivership

Defendants, and any persons receiving notice of this Order by personal service,

facsimile transmission or otherwise, having possession of the property, business, books, records, accounts or assets of the Receivership Defendants or Recoverable Assets are hereby directed to deliver the same to the Receiver, his agents and/or employees.

17.    All banks, brokerage firms, financial institutions, and other persons or entities which have possession, custody or control of any Recoverable Assets or assets or funds held by, in the name of, or for the benefit of, directly or indirectly, and of the Receivership Defendants that receive actual notice of this Order by personal service, facsimile transmission or otherwise shall:

A.    Not liquidate, transfer, sell, convey or otherwise transfer any assets, securities, funds, or accounts in the name of or for the benefit of the Receivership Defendants except upon instructions from the Receiver;

B.    Not exercise any form of set-off, alleged set-off, lien, or any form of self-help whatsoever, or refuse to transfer any funds or assets to the Receiver's control without the permission of this Court;

C.    Within five (5) business days of receipt of that notice, file with the Court and serve on the Receiver and counsel for the Commission a certified statement setting forth, with respect to each such account or other asset, the balance in the account or description of the assets as of the close of business on the date of receipt of the notice; and,

D.    Cooperate expeditiously in providing information and transferring funds, assets and accounts to the Receiver or at the direction of the Receiver.

## V. <u>Access to Real and Personal Property</u>

18.　　The Receiver is authorized to take immediate possession of all

personal property of the Receivership Defendants, wherever located, including but

not limited to electronically stored information, computers, laptops, hard drives,

external storage drives, and any other such memory, media or electronic storage

devices, books, papers, data processing records, evidence of indebtedness, bank

records and accounts, savings records and accounts, brokerage records and

accounts, certificates of deposit, stocks, bonds, debentures, and other securities and

investments, contracts, mortgages, furniture, office supplies and equipment.

19　　The Receiver is authorized to take immediate possession of all real

property of the Receivership Defendants, wherever located, including but not

limited to all ownership and leasehold interests and fixtures.  Upon receiving actual

notice of this Order by personal service, facsimile transmission or otherwise, all

persons other than law enforcement officials acting within the course and scope of

their official duties, are (without the express written permission of the Receiver)

prohibited from: (a) entering such premises; (b) removing anything from such

premises; or, (c) destroying, concealing or erasing anything on such premises.

20.　　In order to execute the express and implied terms of this Order, the

Receiver is authorized to change door locks to the premises described above.  The

Receiver shall have exclusive control of the keys.  The Receivership Defendants, or any other person acting or purporting to act on their behalf, are ordered not to change the locks in any manner, nor to have duplicate keys made, nor shall they have keys in their possession during the term of the receivership.

21.     The Receiver is authorized to open all mail directed to or received by or at the offices or post office boxes of the Receivership Defendants, and to inspect all mail opened prior to the entry of this Order, to determine whether items or information therein fall within the mandates of this Order.

22.     Upon the request of the Receiver, the United States Marshal Service, in any judicial district, is hereby ordered to assist the Receiver in carrying out his duties to take possession, custody and control of, or identify the location of any Recoverable Assets or assets, records or other materials belonging to the Receivership Estate.

## VI. Notice to Third Parties

23.     The Receiver shall promptly give notice of his appointment to all known officers, directors, agents, employees, shareholders, creditors, debtors, managers and general and limited partners of the Receivership Defendants, and all persons known to possess Recoverable Assets, as the Receiver deems necessary or advisable to effectuate the operation of the receivership.

24.    All persons and entities owing any obligation, debt, or distribution

with respect to an ownership interest to any Receivership Defendant shall, until

further ordered by this Court, pay all such obligations in accordance with the terms

thereof to the Receiver and its receipt for such payments shall have the same force

and effect as if the Receivership Defendant had received such payment.

25.    In furtherance of his responsibilities in this matter, the Receiver is

authorized to communicate with, and/or serve this Order upon, any person, entity

or government office that he deems appropriate to inform them of the status of this

matter and/or the financial condition of the Receivership Estate.   All government

offices which maintain public files of security interests in real and personal

property shall, consistent with such office's applicable procedures, record this

Order upon the request of the Receiver or the SEC.

26.    The Receiver is authorized to instruct the United States Postmaster to

hold and/or reroute mail which is related, directly or indirectly, to the business,

operations or activities of any of the Receivership Defendants (the "Receiver's

Mail"), including all mail addressed to, or for the benefit of, the Receivership

Defendants. The Postmaster shall not comply with, and shall immediately report

to the Receiver, any change of address or other instruction given by anyone other

than the Receiver concerning the Receiver's Mail.  The Receivership Defendants

shall not open any of the Receiver's Mail and shall immediately turn over such mail, regardless of when received, to the Receiver. All personal mail of any individual Receivership Defendants, and/or any mail appearing to contain privileged information, and/or any mail not falling within the mandate of the Receiver, shall be released to the named addressee by the Receiver. The foregoing instructions shall apply to any proprietor, whether individual or entity, of any private mail box, depository, business or service, or mail courier or delivery service, hired, rented or used by the Receivership Defendants. The Receivership Defendants shall not open a new mailbox, or take any steps or make any arrangements to receive mail in contravention of this Order, whether through the U.S. mail, a private mail depository or courier service.

27.     Subject to payment for services provided, any entity furnishing water, electric, telephone, sewage, garbage or trash removal services to the Receivership Defendants shall maintain such service and transfer any such accounts to the Receiver unless instructed to the contrary by the Receiver.

28.     The Receiver is authorized to assert, prosecute and/or negotiate any claim under any insurance policy held by or issued on behalf of the Receivership Defendants, or their officers, directors, agents, employees or trustees, and to take any and all appropriate steps in connection with such policies.

## VII. <u>Injunction Against Interference with Receiver</u>

29.     Defendants Alexander and McClintock, the Receivership Defendants, and all persons receiving notice of this Order by personal service, facsimile or otherwise, are hereby restrained and enjoined from directly or indirectly taking any action or causing any action to be taken, without the express written agreement of the Receiver, which would:

A.     Interfere with the Receiver's efforts to take control, possession, or management of any Receivership Asset or Recoverable Asset; such prohibited actions include but are not limited to, using self-help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution, or other process for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any Receivership Asset or Recoverable Asset;

B.     Hinder, obstruct or otherwise interfere with the Receiver in the performance of his duties; such prohibited actions include but are not limited to, concealing, destroying or altering records or information;

C.     Dissipate or otherwise diminish the value of any Receivership Asset or Recoverable Asset; such prohibited actions include but are not limited to, releasing claims or disposing, transferring, exchanging, assigning or in any way conveying any Receivership Asset or Recoverable Asset, enforcing judgments, assessments or claims against any Receivership Asset, any Recoverable Asset, or any Receivership Defendant, attempting to modify, cancel, terminate, call, extinguish, revoke or accelerate (the due date), of any lease, loan, mortgage, indebtedness, security agreement or other agreement executed by any Receivership Defendant or which otherwise affects any Receivership Asset or Recoverable Asset; or,

>    D.    Interfere with or harass the Receiver, or interfere in any manner
>          with the exclusive jurisdiction of this Court over the
>          Receivership Estate.

30.    Defendants Alexander and McClintock and the Receivership

Defendants shall cooperate with and assist the Receiver in the performance of his

duties.

31.    The Receiver shall promptly notify the Court and SEC counsel of any

failure or apparent failure of any person or entity to comply in any way with the

terms of this Order.

## VIII. Stay of Litigation

32.    As set forth in detail below, the following proceedings, excluding the

instant proceeding and all police or regulatory actions and actions of the

Commission related to the above-captioned enforcement action, are stayed until

further Order of this Court:

> All civil legal proceedings of any nature, including, but not limited to,
> bankruptcy proceedings, arbitration proceedings, foreclosure actions, default
> proceedings, or other actions of any nature involving: (a) the Receiver, in his
> capacity as Receiver; (b) any Receivership Asset, wherever located; (c) any
> of the Receivership Defendants, including subsidiaries and partnerships; or,
> (d) any of the Receivership Defendants' past or present officers, directors,
> managers, agents, or general or limited partners sued for, or in connection
> with, any action taken by them while acting in such capacity of any nature,
> whether as plaintiff, defendant, third-party plaintiff, third-party defendant, or
> otherwise (such proceedings are hereinafter referred to as "Ancillary
> Proceedings").

33.     The parties to any and all Ancillary Proceedings are enjoined from commencing or continuing any such legal proceeding, or from taking any action, in connection with any such proceeding, including, but not limited to, the issuance or employment of process.

34.     All Ancillary Proceedings are stayed in their entirety, and all Courts having any jurisdiction thereof are enjoined from taking or permitting any action until further Order of this Court.   Further, as to a cause of action accrued or accruing in favor of one or more of the Receivership Defendants against a third person or party, any applicable statute of limitation is tolled during the period in which this injunction against commencement of legal proceedings is in effect as to that cause of action.

## IX.  Managing Assets

35.     For each of the Receivership Estates, the Receiver shall establish one or more custodial accounts at a federally insured bank to receive and hold all cash equivalent Receivership Assets (the "Receivership Funds").

36.     The Receiver's deposit account shall be entitled "Receiver's Account, Estate of _____" together with the name of the action.

37.     The Receiver may, without further Order of this Court, transfer, compromise, or otherwise dispose of any Receivership Assets, other than real

estate, in the ordinary course of business, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such Receivership Assets.

38.    Subject to Paragraph 39, immediately below, the Receiver is authorized to locate, list for sale or lease, engage a broker for sale or lease, cause the sale or lease, and take all necessary and reasonable actions to cause the sale or lease of all real property in the Receivership Estate, either at public or private sale, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such real property.

39.    Upon further Order of this Court, pursuant to such procedures as may be required by this Court and additional authority such as 28 U.S.C. §§ 2001 and 2004, the Receiver will be authorized to sell, and transfer clear title to, all real property in the Receivership Estates.

40.    The Receiver is authorized to take all actions to manage, maintain, and/or wind-down business operations of the Receivership Estate, including making legally required payments to creditors, employees, and agents of the Receivership Estate and communicating with vendors, investors, governmental and regulatory authorities, and others, as appropriate.

41.   The Receiver shall take all necessary steps to enable the Receivership Funds to obtain and maintain the status of a taxable "Settlement Fund," within the meaning of Section 468B of the Internal Revenue Code and of the regulations, when applicable, whether proposed, temporary or final, or pronouncements thereunder, including the filing of the elections and statements contemplated by those provisions.  The Receiver shall be designated the administrator of the Settlement Fund, pursuant to Treas. Reg. § 1.468B-2(k)(3)(i), and shall satisfy the administrative requirements imposed by Treas. Reg. § 1.468B-2, including but not limited to (a) obtaining a taxpayer identification number, (b) timely filing applicable federal, state, and local tax returns and paying taxes reported thereon, and (c) satisfying any information, reporting or withholding requirements imposed on distributions from the Settlement Fund.  The Receiver shall cause the Settlement Fund to pay taxes in a manner consistent with treatment of the Settlement Fund as a "Qualified Settlement Fund."  The Receivership Defendants shall cooperate with the Receiver in fulfilling the Settlement Funds' obligations under Treas. Reg. § 1.468B-2].

## X. Investigate and Prosecute Claims

42.   Subject to the requirement, in Section VII above, that leave of this Court is required to resume or commence certain litigation, the Receiver is

authorized, empowered and directed to investigate, prosecute, defend, intervene in

or otherwise participate in, compromise, and/or adjust actions in any state, federal

or foreign court or proceeding of any kind as may in his discretion, and in

consultation with SEC counsel, be advisable or proper to recover and/or conserve

Receivership Assets or Recoverable Assets.

43.     Subject to his obligation to expend receivership funds in a reasonable

and cost-effective manner, the Receiver is authorized, empowered and directed to

investigate the manner in which the financial and business affairs of the

Receivership Defendants were conducted and (after obtaining leave of this Court)

to institute such actions and legal proceedings, for the benefit and on behalf of the

Receivership Estate, as the Receiver deems necessary and appropriate; the

Receiver may seek, among other legal and equitable relief, the imposition of

constructive trusts, disgorgement of profits, asset turnover, avoidance of fraudulent

transfers, rescission and restitution, collection of debts, and such other relief from

this Court as may be necessary to enforce this Order.  Where appropriate, the

Receiver should provide prior notice to Counsel for the Commission before

commencing investigations and/or actions.

44.     The Receiver hereby holds, and is therefore empowered to waive, all

privileges, including the attorney-client privilege, held by all entity Receivership

Defendants.

45.     The Receiver has a continuing duty to ensure that there are no conflicts of interest between the Receiver, his Retained Personnel (as that term is defined below), and the Receivership Estate.

## XII.  Bankruptcy Filing

46.     The Receiver may seek authorization of this Court to file voluntary petitions for relief under Title 11 of the United States Code (the "Bankruptcy Code") for the Receivership Defendants.  If a Receivership Defendant is placed in bankruptcy proceedings, the Receiver may become, and may be empowered to operate the Receivership Estate as, a debtor in possession.  In such a situation, the Receiver shall have all of the powers and duties as provided a debtor in possession under the Bankruptcy Code to the exclusion of any other person or entity. Pursuant to Paragraph 4 above, the Receiver is vested with management authority for all entity Receivership Defendants and may therefore file and manage a Chapter 11 petition.

47.     The provisions of Section VIII above bar any person or entity, other than the Receiver, from placing any of the Receivership Defendants in bankruptcy proceedings.

## XII.  Liability of Receiver

48.     Until further Order of this Court, the Receiver shall not be required to post bond or give an undertaking of any type in connection with his fiduciary obligations in this matter.

49.     The Receiver and his agents, acting within scope of such agency ("Retained Personnel") are entitled to rely on all outstanding rules of law and Orders of this Court and shall not be liable to anyone for their own good faith compliance with any order, rule, law, judgment, or decree.  In no event shall the Receiver or Retained Personnel be liable to anyone for their good faith compliance with their duties and responsibilities as Receiver or Retained Personnel, nor shall the Receiver or Retained Personnel be liable to anyone for any actions taken or omitted by them except upon a finding by this Court that they acted or failed to act as a result of malfeasance, bad faith, gross negligence, or in reckless disregard of their duties.

50.     This Court shall retain jurisdiction over any action filed against the Receiver or Retained Personnel based upon acts or omissions committed in their representative capacities.

51.     In the event the Receiver decides to resign, the Receiver shall first give written notice to the Commission's counsel of record and the Court of its

intention, and the resignation shall not be effective until the Court appoints a

successor.  The Receiver shall then follow such instructions as the Court may

provide.

### XIII.  <u>Recommendations and Reports</u>

52.    The Receiver is authorized, empowered and directed to develop a plan

for the fair, reasonable, and efficient recovery, liquidation, and distribution of all

remaining, recovered, and recoverable Receivership Assets (the "Distribution

Plan").

53.    Within ninety (60) days of the entry date of this Order, the Receiver

shall file his first interim report addressing, at a minimum, the following:

(a)    the assets and liabilities of the Receivership Defendants;

(b)    assets held by others, which represent or were purchased with

funds raised from investors in the scheme described in the SEC's complaint, and a

proposal for bringing such Recoverable Assets into the receivership estate;

(c)    third party claims, including, but not limited to, claims for

recovery of commissions, referral fees, or any incentive payment for introducing

new investors to the scheme described in the SEC's complaint, and claims against

investors who received from the scheme more than they invested;

(d)    to the extent that he recommends pursuit of claims identified in

subsection (c) above, the terms of representation for attorneys to pursue such actions and the estimated expenses to be incurred in such pursuit (exclusive of attorney's fees); and

      (e)    a recommendation as to whether continuing the receivership is likely to generate funds sufficient to pay administrative and tax claims and to generate a fund for distribution to approved claimants.

      54.    For the duration of the receivership, within thirty (30) days after the end of each calendar quarter, the Receiver shall file and serve a full report and accounting of each Receivership Estate (the "Quarterly Status Report"), reflecting (to the best of the Receiver's knowledge as of the period covered by the report) the existence, value, and location of all Receivership Assets and Recoverable Assets, and of the extent of liabilities, both those claimed to exist by others and those the Receiver believes to be legal obligations of the Receivership Estates.

      55.    The Quarterly Status Report shall contain the following:

      A.    A summary of the operations of the Receiver;

      B.    The amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

      C.    A schedule of all the Receiver's receipts and disbursements (attached as Exhibit A to the Quarterly Status Report), with one column for the quarterly period covered and a second column for the entire duration of the receivership;

D.   A description of all known Receivership Assets, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended;

E.   A description of liquidated and unliquidated claims held by the Receivership Estate, including the need for forensic and/or investigatory resources; approximate valuations of claims; and anticipated or proposed methods of enforcing such claims (including likelihood of success in: (i) reducing the claims to judgment; and, (ii) collecting such judgments);

F.   A list of all known creditors with their addresses and the amounts of their claims;

G.   The status of Creditor Claims Proceedings, after such proceedings have been commenced; and,

H.   The Receiver's recommendations for a continuation or discontinuation of the receivership and the reasons for the recommendations.

56.   On the request of the Commission, the Receiver shall provide the Commission with any documentation that the Commission deems necessary to meet its reporting requirements, that is mandated by statute or Congress, or that is otherwise necessary to further the Commission's mission.

## XIV.  Fees, Expenses and Accountings

57.   Subject to Paragraphs 58 – 64 immediately below, the Receiver need not obtain Court approval prior to the disbursement of Receivership Funds for expenses in the ordinary course of the administration and operation of the

receivership. Further, prior Court approval is not required for payments of applicable federal, state or local taxes, or for necessary and reasonable expenses (other than attorney's fees) of approved litigation.

58.     Subject to Paragraph 59 immediately below, the Receiver is authorized to solicit persons and entities ("Retained Personnel") to assist him in carrying out the duties and responsibilities described in this Order. The Receiver shall not engage any Retained Personnel without first obtaining an Order of the Court authorizing such engagement.

59.     The Receiver and Retained Personnel are entitled to reasonable compensation and expense reimbursement from the Receivership Estates as described in the "Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission" (the "Billing Instructions") agreed to by the Receiver. Such compensation shall require the prior approval of the Court.

60.     Within forty-five (45) days after the end of each calendar quarter, the Receiver and Retained Personnel shall apply to the Court for compensation and expense reimbursement from the Receivership Estates (the "Quarterly Fee Applications"). At least thirty (30) days prior to filing each Quarterly Fee Application with the Court, the Receiver will serve upon counsel for the SEC a complete copy of

the proposed Application, together with all exhibits and relevant billing information in a format to be provided by SEC staff.

61.    All Quarterly Fee Applications will be interim and will be subject to cost benefit and final reviews at the close of the receivership.  At the close of the receivership, the Receiver will file a final fee application, describing in detail the costs and benefits associated with all litigation and other actions pursued by the Receiver during the course of the receivership.

62.    Quarterly Fee Applications may be subject to a holdback in the amount of 20% of the amount of fees and expenses for each application filed with the Court.  The total amounts held back during the course of the receivership will be paid out at the discretion of the Court as part of the final fee application submitted at the close of the receivership.

63.    Each Quarterly Fee Application shall:

   A.    Comply with the terms of the Billing Instructions agreed to by the Receiver; and,

   B.    Contain representations (in addition to the Certification required by the Billing Instructions) that: (i) the fees and expenses included therein were incurred in the best interests of the Receivership Estate; and, (ii) with the exception of the Billing Instructions, the Receiver has not entered into any agreement, written or oral, express or implied, with any person or entity concerning the amount of compensation paid or to be paid from the Receivership Estate, or any sharing thereof.

64.    At the close of the Receivership, the Receiver shall submit a Final

Accounting, in a format to be provided by SEC staff, as well as the Receiver's final

application for compensation and expense reimbursement.

IT IS SO ORDERED, this 9th day of June, 2014.

s/Steve C. Jones
Steve C. Jones
Unites States District Judge

**Proposed Order Prepared By:**

Jason L. Nohr, Esq.
Receiver for MSC Holdings, Inc.
Cauthorn Nohr & Owen
212 Church Street
Marietta, GA  30060
(770) 528-0150
(770) 528-0160 – fax
jln@cauthornnohr.com

14-mc-0103

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

SECURITIES AND EXCHANGE )
COMMISSION, )
  )
    Plaintiff, )
  )
v. )
  )
BILLY WAYNE McCLINTOCK )
individually, and dba MSC )
HOLDINGS, DIANNE )
ALEXANDER aka LINDA )
DIANNE ALEXANDER, )
  )
    Defendants, )
  )
MSC HOLDINGS USA, LLC, )
MSC HOLDINGS, INC., MSC GA )
HOLDINGS, LLC, )
  )
    Relief Defendants. )

CIVIL ACTION FILE

NO. 1:12-CV-04028-SCJ
(N.D. Georgia)

## NOTICE OF RECEIVERSHIP

COMES NOW, Jason L. Nohr as the Court-appointed Receiver for Billy Wayne McClintock, MSC Holdings, Dianne Alexander, et al. and hereby provides notice of his appointment as Receiver pursuant to 28 U.S.C. § 754 and files with the Clerk of this Court a copy of the Complaint (attached as "Exhibit A") and the Order Appointing Receiver (attached as "Exhibit B").

Respectfully submitted, this 10TH day of June, 2014.

**CAUTHORN, NOHR & OWEN**

Jason L. Nohr
Georgia Bar No. 545435
Receiver

212 Church Street
Marietta, Georgia  30060
770.528.0150
770.528.0160 – facsimile
jln@cauthornnohr.com

2

ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C - Atlanta

NOV 1 9 2012

JAMES N. HATTEN, Clerk
By: ~~~~~~
Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff | : | **SCJ** |
| | : | |
| vs. | : | Civil Action File No. |
| | : | **1:12-CV-4028** |
| BILLY WAYNE McCLINTOCK, individually, and dba MSC Holdings, DIANNE ALEXANDER aka LINDA DIANNE ALEXANDER, | : | **JURY TRIAL DEMANDED** |
| | : | |
| Defendants, | : | |
| | : | |
| MSC HOLDINGS USA, LLC, MSC HOLDINGS, INC., MSC GA HOLDINGS, LLC, | : | |
| | : | |
| Relief Defendants. | : | |

## COMPLAINT FOR INJUNCTIVE RELIEF

Plaintiff, Securities and Exchange Commission (the "Commission"), files its

complaint and alleges that:

**EXHIBIT A**

## OVERVIEW

1.     This matter involves an on-going "prime bank" scheme (a brand of Ponzi scheme), promising annual returns of 38 percent to be generated by a purported clandestine, highly exclusive organization in Europe known only as "the Trust."

2.     The defendants told hundreds of investors that the Trust was created after World War II by a group of extremely wealthy families, that the Trust owns European banks, and that it has the power to create money through fractional banking and the sale of bank debentures.  But, according to the defendants,  access to the Trust is open only to close friends and family members of current investors, and is subject to strict secrecy rules, violation of which results in banishment from further investment in the Trust.

3.     .From at least 2004, Defendants Billy Wayne McClintock ("McClintock") and Dianne Alexander ("Alexander") collected more than $15 million from over 220 investors in more than 20 states, including Georgia, by repeating the lies set forth above, and others.

4.     The Trust, on which the whole venture depends, does not exist.  The defendants used fund raised to make payments to themselves, to pay sums owed to earlier investors and for other undisclosed purposes.

5.      Alexander especially resorted to an appeal to Christian faith when pitching the investment, calling the old adage "If it sounds too good to be true, it probably is," "A lie that came from the pit of hell," and saying, "Put your money in the Trust and your trust in God."

6.      Although the defendants called their transaction with investors "loans," each transaction was the sale of a "security" as defined in federal securities law, and defendants were acting as "brokers" as defined in those laws.

7.      Defendants did not register with the Commission as brokers, and did not register the securities with the Commission before offering them.

8.      The defendants sold the supposed loans through a host of bold misrepresentations and material omissions about the fictitious Trust.

9.      McClintock, a Florida resident and convicted felon, claimed to be the United States Director of the Trust.

10.     Alexander, a former Georgia resident, claimed to be a United States Regional Director for the Trust.

11.     McClintock and Alexander led investors to believe they could loan money to the Trust and receive 38% interest annually on their investment, provided that they abide by the Trust's strict secrecy rules.

12.     McClintock and Alexander have conducted, and continue to conduct, a fraudulent scheme, making material misrepresentations and omissions of fact to investors concerning, among other things, the expected returns, the use of investor funds, and the investment risks.

13.     Unless restrained by this Court, the defendants will continue with their scam.

## VIOLATIONS

14.     Defendants have engaged and, unless restrained and enjoined by this Court, will continue to engage in acts and practices that constitute and will constitute violations of Sections 5(a), 5(c ), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and 77e(c) and 77q(a)] and Section 10(b) and 15(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78o(a)] and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5 (a), (b), & (c)].

15.     Additionally, defendants have aided and abetted and, unless restrained and enjoined by this Court, will continue to aid and abet violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C.  § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## JURISDICTION AND VENUE

16.     The Commission brings this action pursuant to Sections 20 and 22 of the

Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21(d) and 21(e) of the

Exchange Act [15 U.S.C. §§78u(d) and 78u(e)] to enjoin defendants from engaging

in the transactions, acts, practices, and courses of business alleged in this complaint,

and transactions, acts, practices, and courses of business of similar purport and

object.

17.     This Court has jurisdiction over this action pursuant to Section 22 of the

Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21(d), 21(e), and 27 of the

Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

18.     Defendants, directly and indirectly, made use of the mails, and the means

instruments of transportation and communication in interstate commerce and the

means and instrumentalities of interstate commerce in connection with the

transactions, acts, practices, and courses of business alleged in this complaint.

19.     Certain of the transactions, acts, practices, and courses of business

constituting violations of the Securities Act and the Exchange Act occurred in the

Northern District of Georgia.  Venue is proper in this Court pursuant to 28 U.S.C.

§ 1391(b)(2).

20.     Defendants, unless restrained and enjoined by this Court, will continue to engage in the transactions, acts, practices, and courses of business alleged in this complaint, and in transactions, acts, practices, and courses of business of similar purport and object.

### The Defendants

21.     Billy Wayne McClintock, individually and d/b/a MSC Holdings, age 70, is a resident of Bradenton, Florida. He was convicted of cocaine trafficking in 1989, and served time in prison in Kentucky. On information and belief, McClintock has never been registered as or associated with a broker. He claims to have earned a living as a gospel singer.

22.     Dianne Alexander a/k/a Linda Dianne Alexander, age 70, was a resident of Cumming, Georgia at the time of much of the misconduct at issue. She currently resides in Carlsbad, California. On information and belief, Alexander has never been registered as or associated with a broker.

### Relief Defendants

23.     MSC Holdings USA, LLC ("MSC USA") was created in Florida as a limited liability company on November 12, 2009. On September 24, 2010, MSC

USA was administratively dissolved.  McClintock owned and controlled MSC
USA.

24.     MSC Holdings, Inc. ("MSC Inc.") is the name of an apparent corporation
controlled by McClintock.  The Commission has found no evidence of the
company's actual incorporation.  But, that company has held bank accounts used to
collect and disburse investor funds.

25.     MSC GA Holdings, LLC ("MSC GA") was incorporated in Georgia as a
limited liability company on October 3, 2007.  On September 5, 2012, MSC GA
was administratively dissolved.  Alexander owned and controlled MSC GA.

## THE PRIME BANK SCHEME

26.     By the late 1990s, Defendants McClintock and Alexander had been friends
for many years.

27.     At some point before 2002, McClintock told Alexander about his investment
in an entity that he called the Trust.

28.     McClintock told Alexander the following about the Trust and how he came
to be associated with it:

a.      In the 1990's, while McClintock was on a business trip in London, he met a man named "John" who was an officer of the Trust.

b.      Because of McClintock's relationship with John, McClintock became aware of an opportunity to lend money to the Trust and receive at least 38% annual interest.

c.      The Trust was started after World War II and is comprised of several extremely wealthy European families. The Trust is headquartered in London and has offices in Luxembourg and Zurich.

d.      The Trust owns banks in Europe.  The Trust has the power to create money through fractional banking and the sale of banking debentures. The Trust funds humanitarian projects around the world.

e.      Details about the Trust are very secretive and cannot be discussed openly by other investors in public.

f.      The opportunity to invest in the Trust is only available due to McClintock's personal relationship with the Trust and the

opportunity can only be offered by other investors to their family and close friends.

g.      Investors can loan money to the Trust through renewable contracts of one year and one day, and earn interest of 38 percent per year.

h.      Investors are required to pay the minimum investment amount.  This minimum amount varied, and typically was $35,000 or $50,000 for most investors.

i.      Any investor who speaks about the details of the Trust to anyone who is not family or a close friend (except with permission from McClintock and/or Alexander) would be banned from further participation in the Trust.

j.      Any investor who reveals anything about the Trust to an attorney, certified public accountant, or financial planner would be banned from further participation in the Trust.

k.      Any investor who decides not to renew his or her loan and instead requests a return of principal will be banned from further participation in the Trust.

l.    If an investor's referral to the Trust breaks one of the Trust's rules, then both the referring investor and the referral will be banned from further participation in the Trust.

29.    Alexander not only invested, but also accepted McClintock's offer to be a United States Regional Director for the Trust.

30.    According to Alexander, there are three additional Regional Directors, but she claims not to know them.

31.    McClintock is the purported United States National Director for the Trust.

32.    Both individually and together, McClintock and Alexander have been telling the story outlined in paragraph 28 above to prospective investors since at least 2004.

33.    Embellishments to the central representations varied— in one version the U.S. Department of Homeland Security is the largest borrower from the Trust— but the central misrepresentations of the scheme stay the same.

34.    Apparently attempting to avoid scrutiny by federal securities enforcers, McClintock told Alexander not to refer to investor payments as an "investment," but rather as a "loan," and that she should never refer to those whose money she took as "investors," but rather as "Trust lenders."

35.    As Regional Director, Alexander was responsible for "managing" loans from investors in 10 states.

36.    She received, from McClintock, management fees of five percent of the principal amount invested by any persons she referred to the Trust, when the investor loan "matured" (*i.e.,* after one year).

37.    If an investor rolled over his or her principal into a new contract, she received another five percent fee.

38.    If one of her downline investors referred a new investor to the Trust, she received a five percent fee and the referring investor received a five percent fee.

39.    McClintock and Alexander signed and delivered to investors various forms of a one-page written contract evidencing the investors' initial investments and any rollovers of their investments into new contracts (the "Investor Agreements").

40.    McClintock and Alexander used no other documents in this scam.

41.    Neither Alexander nor McClintock asked prospective investor about their personal financial condition or the source of their invested funds or took any steps to qualify them as accredited investors.

42.    The Investor Agreements did not mention the Trust.  Instead, McClintock and Alexander orally provided information about the Trust to investors.

43.    Although Alexander made the representations to most of the investors, McClintock was present for at least one meeting at which Alexander spoke to a prospective investor about the Trust.

44.    In her role as purported Regional Director, Alexander hosted at least one social gathering of "Trust Lenders" and their guests in Georgia.

45.    At this social gathering, some investors gave testimonials regarding their positive experiences in getting paid by the Trust.

46.    McClintock personally entered into and signed Investor Agreements with his downline investors, including Alexander.

47.    After Alexander became a purported Regional Director in 2004, she began to tell others about the opportunity to invest in the Trust.

48.    According to Alexander, she told prospective investors substantially the same information that McClintock told her and other investors before and after she became an investor.

49.    Alexander in turn personally entered into and signed Investor Agreements with her downline investors.

50.    None of the contracts disclosed whether fees or other payments would be made to McClintock, Alexander, or other referring investors from the invested principal, or the amount of any such payments.

51.    The contract term was for "One Year and a Day."  Most of the contracts provided that "placement" of the investor funds would automatically roll over for one year and one day unless the investor gave timely notice otherwise.

52.    If a contract rolled over, McClintock or Alexander and the investor signed another contract.

53.    From at least 2004, Investor Agreements consistently provided for expected returns of 38% interest per year.

54.    The Investor Agreements contained various statements cryptically describing loans to be managed by McClintock or Alexander, rather than stating that the loans ostensibly were being made to the Trust.

55.    McClintock signed contracts with at least 10 investors, and rolled over their contracts multiple times.  He executed contracts, including rollovers, with Alexander and other investors as late as July 2012 and possibly later.  His contracts reflect principal investments of at least $300,000.

56.    From 2004, Alexander signed contracts with at least 220 investors, and rolled over their contracts multiple times.  Her contracts reflect principal

investments of well over $15 million. She executed contracts with other investors as late as October 2012, all or substantially all of which appear to be rollover contracts.

57. The defendants never sent investor funds to any purported Trust, whether in Europe or otherwise.

58. Rather, the defendants simply pooled investor funds together, transferred investor funds between their affiliated entities, made regular "interest" payments to investors, and garnered substantial payments for themselves.

59. Alexander's investors generally made their checks payable to proposed relief defendant MSC GA, Alexander's controlled entity.

60. Alexander then deposited the funds into one or more bank accounts in MSC GA's name.

61. At McClintock's instruction, Alexander then sent the entire amount of the invested principal to one of McClintock's controlled bank accounts.

62. McClintock used at least 10 bank accounts at several banks over the years.

63. Some of those accounts were in the name of relief defendants MSC USA and MSC Inc.

64. Alexander also delivered to McClintock the new and rollover Investor Agreements with her downline investors. She sent regular e-mails to McClintock

advising him of contracts that had matured that month and notifying him of

whether any investors wanted to compound their interest and renew their contract,

or receive an interest payment.

65.    McClintock then caused his entities to transfer back to MSC GA, for

distribution by Alexander, amounts purportedly for interest, fees, or returns of

principal.  Portions of these payments were retained by Alexander.

66.    Available bank account records also show checks signed by McClintock and

made payable to cash, himself, his affiliated entities, and other questionable

sources.

67.    Alexander has signed an Investor Agreement showing that she has received

at least $2,005,085 from the scheme thus far.

68.    McClintock and Alexander knowingly or recklessly made

misrepresentations and omissions of material fact to investors and prospective

investors about the purported investments in the Trust.

69.    Among other things, McClintock and Alexander represented, directly and

indirectly, that the investor funds would be used for lucrative banking or other

operations by the Trust, when in fact the Trust does not exist and in any event

McClintock does not appear to have transferred substantial investor funds to the

purported Trust.

70.     The proposed defendants failed to disclose to investors and prospective investors the considerable risk of loss to their principal and purported interest of investing in an entity that is non-existent.

71.     The Investor Agreements signed by McClintock and Alexander were false and misleading because they led investors to expect consistent profits of 38 percent on their investment per year, when the defendants had no reasonable basis to project those profits.

72.     Alexander recklessly relied solely on McClintock's representations about the profits to be generated by the Trust, without taking any independent steps to either verify the existence of the Trust or whether McClintock was in fact receiving payments from the Trust.

73.     McClintock had no reasonable basis to project 38 percent returns, particularly when available bank account records do not indicate that any such returns were deposited into his controlled accounts.

74.     The representations in numerous rollover Investor Agreements summarizing the accrued interest paid to date were also false and misleading, since no such interest actually existed.  Instead, the Trust is a Ponzi scheme in which new investor funds, not Trust profits, pay the purported fees and interest owed to earlier investors.

75.     McClintock and Alexander failed adequately to disclose the existence and amount of the commissions and other payments they received to all investors and prospective investors.

76.     As part of the fraudulent scheme, the proposed relief defendants, MSC USA, MSC Inc., and MSC GA (affiliated entities of McClintock and Alexander), were used to divert funds and may still hold investor funds or other assets in bank accounts or other locations without any legitimate claim to the assets.  They did not provide value in exchange for the funds transferred to them.

### COUNT ONE – UNREGISTERED OFFERING OF SECURITIES

**Violation of Sections 5(a) and 5(c) of the**
**Securities Act [15 U.S.C. § 77o(a) and 77o(c)**

#### (McClintock and Alexander)

77.     Paragraphs 1 through 76 are hereby realleged and incorporated herein by reference.

78.     No registration statement has been filed or is in effect with the Commission pursuant to the Securities Act and no exemption from registration with respect to the transactions described herein.

79.     From at least 2004 to present, Defendants, singly and in concert, have:

    (a)    made use of the mean or instruments of transportation or communication in interstate commerce of the mails to sell securities, through the use or medium of a prospectus or otherwise;

    (b)    carried securities or caused such securities to be carried through the mails or in interstate commerce, by any mean or instruments of transportation, for the purpose of sale or for delivery after sale; and

    (c)    made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy securities, through the use or medium of any prospectus or otherwise, without a registration statement have been filed with the Commission as to such securities.

80.    By reason of the foregoing, Defendants, directly and indirectly, singly and in concert, have violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## COUNT TWO – FRAUD

### <u>Violations of Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)]</u>
### (McClintock and Alexander)

81.    Paragraphs 1 through 76 are hereby re-alleged and are incorporated herein by reference.

82.     From at least 2004 to at present, Defendants, in the offer and sale of the securities described herein, by use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud purchasers of such securities, all as more particularly described above.

83.     Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.

84.     While engaging in the course of conduct described above, defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severely reckless disregard for the truth.

85.     By reason of the foregoing, defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT THREE – FRAUD

### Violations of Sections 17(a)(2) and 17(a)(3)
### of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]

### (McClintock and Alexander)

86.    Paragraphs 1 through 76  are hereby realleged and are incorporated herein by reference.

87.    From at least 2004 to at present, Defendants, in the offer and sale of the securities described herein, by use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

 a.    obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

 b.    engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

88.     By reason of the foregoing, defendants, directly and indirectly, have violated

and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the

Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

### COUNT FOUR—FRAUD

**Violations of Section 10(b) of the Exchange Act**
**[15 U.S.C. § 78j(b)]and Rules 10b-5(a), (b), and (c)**
**thereunder [17 C.F.R. § 240.10b-5 (a), (b), & (c)]**

### (McClintock and Alexander)

89.   Paragraphs 1 through 76 are hereby re-alleged and are incorporated herein

by reference.

90.   From at least 2004 to present, defendants, in connection with the purchase

and sale of securities described herein, by the use of the means and

instrumentalities of interstate commerce and by use of the mails, directly and

indirectly:

a.      employed devices, schemes, and artifices to defraud;

b.      made untrue statements of material facts and omitted to state material

facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading; and

c.      engaged in acts, practices, and courses of business which would and

did operate as a fraud and deceit upon the purchasers of such securities,

all as more particularly described above.

91. Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business. In engaging in such conduct, defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severely reckless disregard for the truth.

92. By reason of the foregoing, defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b), & (c)].

## COUNT FIVE—AIDING AND ABETTING FRAUD

**Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]
And Section 10(b) of the Exchange Act
[15 U.S.C. § 78j(b)]and Rules 10b-5(a), (b), and (c)
thereunder [17 C.F.R. § 240.10b-5 (a), (b), & (c)]**

### (McClintock and Alexander)

93. Paragraphs 1 through 76 are hereby re-alleged and are incorporated herein by reference.

94. From at least 2004 to present, defendants, in connection with the purchase and sale of securities described herein, by the use of the means and

instrumentalities of interstate commerce and by use of the mails, directly and indirectly aided and abetted each other's primary violations described in Counts two through four above:

95.    Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business.  In engaging in such conduct, defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severely reckless disregard for the truth.

96.    By reason of the foregoing, defendants, directly and indirectly, have aided and abetted and, unless enjoined, will continue to aid and abet violations of Section 17(a) of the Securities Act [15 U.S.C. 77q(a)], Section10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b), & (c)].

## COUNT SIX--UNREGISTERED BROKER-DEALER

### Violations of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)]

### (McClintock and Alexander)

97.    Paragraphs 1 through 76 are hereby restated and incorporated by reference.

98.    From at least 2004 to at least present, defendants have been using the mails and the means and instrumentalities of interstate commerce to effect transactions in, or induce or attempt to induce the purchase or sale of securities, without registering with the Commission as a broker, as more particularly described above.

99.    By reason of the foregoing, defendants have violated Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## COUNT SEVEN- UNJUST ENRICHMENT

### (Relief Defendants)

100.   Paragraphs 1 through 76 are hereby restated and incorporated by reference.

101.   The relief defendants have received, are receiving, and currently hold the proceeds of the violations outlined above.

102.   The relief defendants have been unjustly enriched by the receipt of investor funds.

103.   The relief defendants have no legitimate claim to the investor funds they have received and should be required to disgorge it, plus prejudgment interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Commission respectfully prays for:

## I.

Findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, finding that defendants named herein committed the violations alleged herein.

## II.

A temporary restraining order, preliminary and permanent injunctions enjoining defendants, their officers, agents, servants, employees, and attorneys from violating, directly or indirectly, Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a). 77e(c), and77 q(a)], and Sections 10(b) and 15(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78o(a)] and Rule 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b), & (c)].

## III.

An order freezing the assets of the defendants and relief defendants.

## IV.

An order requiring an accounting by defendants of the use of proceeds of the fraudulent conduct described in this Complaint and the disgorgement by defendants and relief defendants of all ill-gotten gains or unjust enrichment with prejudgment interest, to effect the remedial purposes of the federal securities laws.

## V.

An order pursuant to Section 24 of the Securities Act [15 U.S.C. § 77x] and

Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)] imposing civil penalties

against defendants.

## VI.

An order providing for expedited discovery.

## VII.

An order requiring the defendants and relief defendants to repatriate funds

transferred outside the United States.

## VIII.

Such other and further relief as this Court may deem just, equitable, and

appropriate in connection with the enforcement of the federal securities laws and for

the protection of investors.

DATED: November 19, 2019[1]

---

[1]     Pursuant to Local Rule 7.1D, counsel for the Commission certifies that this
Complaint has been prepared in 14 point Times New Roman font, which is
approved by the Court in LR 5.1B.

Respectfully submitted,

M. Graham Loomis
Regional Trial Counsel
Georgia Bar No. 457868
loomism@sec.gov

Pat Huddleston II
Senior Trial Counsel
Georgia Bar No. 373984

Attorneys for Plaintiff
Securities and Exchange Commission
950 East Paces Ferry Road, N.E., Suite 900
Atlanta, GA 30326
Tel:(404) 842-7600